IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFFREY C. ZELL and RONNA SUE | ) | |
| ZELL, his wife, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 06-250 |
| | ) | Judge McVerry |
| FEDERAL INSURANCE COMPANY, | ) | Magistrate Judge Hay |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

I.    Recommendation

It is respectfully recommended that the motion for summary judgment submitted on behalf of Defendant (Docket No. 20) be denied.

II.    Report

Plaintiffs, Jeffrey C. Zell and his wife, Ronna Sue Zell, bring this action against Defendant, Federal Insurance Company ("Federal"), seeking coverage under a policy issued to them arising out of the loss of a diamond bracelet. Plaintiffs allege that Defendant breached its contractual duty to indemnify them for the loss and acted in bad faith by denying the claim because of a misrepresentation made in the course of the investigation. Plaintiffs admit that a misrepresentation was made but contend that it is not material to the issue of whether the loss of the bracelet is covered under the policy. Federal has filed a counterclaim, alleging that Plaintiffs have violated the Pennsylvania Insurance Fraud Act, 18 Pa. C.S. § 4117.

Presently before this Court for disposition is a motion for summary judgment, brought by the Defendant. Federal seeks judgment in its favor both on Plaintiffs' claims and on its counterclaim. For the reasons that follow, the motion should be denied.

Facts

On March 2, 2005, Mr. Zell purchased a ladies garland cuff diamond bracelet designed by Penny Preville from Orr's Jewelers as a belated anniversary gift for Mrs. Zell.  (R. Zell Statement Apr. 12, 2005 at 12-13[1]; J. Zell Statement at 13[2]; J. Zell EUO at 78.[3])  The bracelet weighed 13.18 carats, the purchase price was $20,000.00, and it had an appraised value of $37,653.00. (R. Zell Statement Apr. 12, 2005 at 12-13; Def.'s App. Ex. C Ex. B; J. Zell EUO at 79.)  The next day, Mrs. Zell took possession of the bracelet to wear to her nephew's bar mitzvah.  (R. Zell EUO at 70-71;[4] Jaeger Dep. at 54;[5] J. Zell EUO at 79.)  Mrs. Zell then returned the bracelet to Orr's Jewelers in order to have it shipped to Las Vegas, Nevada while the Zells were on a trip to Las Vegas and Los Angeles, California during the period of March 14, 2005 through March 21, 2005.  (R. Zell EUO at 71; Gordon Dep. at 27-29.[6])  Orr's Jewelers shipped the bracelet on March 14, 2005 to the Zells' friend Mark Goldberg in Las Vegas via Federal Express.  An individual at Goldberg's office signed for the package on March 15, 2005.  (McConeghy Dep. at 47.)[7]  Goldberg received the bracelet and personally delivered it to the Zells at the hotel where

---

[1]      Def.'s App. (Docket No. 20) Ex. F-1.

[2]      Def.'s App. Ex. F-2.

[3]      Def.'s App. Ex. J.

[4]      Def.'s App. Ex. G.

[5]      Def.'s App. Ex. E.

[6]      Def.'s App. Ex. H.

[7]      Def.'s App. Ex. I.

they were staying.  (Pls.' App. Ex. 1 at 23.[8])  Mrs. Zell made this arrangement in order to avoid

paying the seven percent Pennsylvania sales tax.  (R. Zell EUO at 76; Gordon Dep. at 27.)

On March 14, 2005, at Mr. Zell's request, Mrs. Zell contacted Orr's Jewelers and

instructed a representative of Orr's Jewelers to contact her insurance agent, Tom Castracane, to

add the bracelet as an Itemized Article pursuant to the policy the Zells had with Federal.  (R. Zell

Statement Apr. 12, 2005 at 23-24; R. Zell EUO at 95-96, 98; J. Zell Statement at 18-19.)  Federal

had issued the Zells policy number 12809258-03, which went into effect on November 11, 2004.

(Def.'s App. Ex. C; Rogers Decl. ¶ 3.[9])  The appraisal was faxed to Castracane that same day

(March 14, 2005).  (Pls.' App. Ex. 1 at 21, 35; Jaeger Dep. at 58.)  Castracane added the bracelet

to the policy as Scheduled Item Number 18.  (Pls.' App. Ex. 1 at 35.)

The parties debate exactly when the bracelet was added to the policy.  Plaintiffs point out

that Federal's workstation notes indicate that, on March 22, 2005 Property Claims Adjustor April

O'Neal made a notation in the file that "VAF item #18 (item lost) was just added to the policy on

3/14/05."  (Pls.' App. Ex. 1 at 45.)  Defendant responds that this notation is in error and it

provides the declaration of Thomas Castracane, the Zells' insurance agent.  He states that:

> On March 14, 2005, my office received a fax requesting that the bracelet be added to the Policy as soon as possible.

> My office first notified Federal of the request on March 22, 2005.

> The bracelet was added to the Policy on March 22, 2005, with an effective date of March 14, 2005.

---

[8]     Docket No. 27.

[9]     Def.'s App. Ex. D.

(Castracane Decl. ¶¶ 4-6.)[10]

After receiving the bracelet in Las Vegas, the Zells traveled to Los Angeles, where they visited with Sophia and Nicholas Geanopulos, family friends from Pittsburgh, who were also vacationing in Los Angeles.  (N. Geanopulos Decl. ¶¶ 3-4;[11] S. Geanopulos Decl. ¶¶ 3-4.[12])  Both Mr. and Mrs. Geanopulos observed Mrs. Zell wearing the bracelet while in Los Angeles. (N. Geanopulos Decl. ¶ 5; S. Geanopulos Decl. ¶ 5.)  Mrs. Zell states that she wore the bracelet periodically during her trip.  (R. Zell EUO at 115-17.)

While changing flights in an airport in Phoenix, Arizona, on the return trip to Pittsburgh, Pennsylvania on March 21, 2005, Mrs. Zell noticed that the bracelet was missing.  (R. Zell EUO at 134-35.)  Believing that the bracelet was lost or stolen while in the airport in Phoenix, Mr. and Mrs. Zell filed a report with America West Airlines as soon as they returned to Pittsburgh, and they notified the Phoenix Police Department.  (Pls.' App. Ex. 1 at 35; R. Zell Statement Mar. 22, 2005 at 3-4, 6;[13] R. Zell Statement Apr. 12, 2005 at 37-38.)  In addition, the Zells reported the loss to Federal immediately upon returning from their trip on March 22, 2005 and submitted an insurance claim pursuant to the policy.  (Pls.' App. Ex. 1 at 43; R. Zell Statement Mar. 22, 2005 at 4.)

At Federal's request, the Zells provided recorded statements on April 12, 2005 to Daniel Jaeger, a Special Investigator for Chubb & Son (a division of Federal) regarding the lost bracelet.

---

[10]     Def.'s Reply Br. (Docket No. 28) Ex. W.

[11]     Pls.' App. Ex. 2.

[12]     Pls.' App. Ex. 3.

[13]     Def.'s App. Ex. A-1.

(Pls.' App. Ex. 1 at 39; Jaeger Dep. at 50-51.)  During the investigation, Mrs. Zell was concerned about the consequences of shipping the bracelet to Las Vegas to avoid paying sales tax on it.  (R. Zell EUO at 101.)  In her recorded statement, she falsely stated that the bracelet had been within her possession and custody during the trip from Pittsburgh to Las Vegas.  (Pls.' App. Ex. 1 at 31-32; R. Zell Statement Apr. 12, 2005 at 19-20.)  Mr. Zell also told Jaeger that, on March 14, 2005, while the Zells were traveling from Pittsburgh to Las Vegas, Mrs. Zell "had the bracelet with her."  (J. Zell Statement at 18, 23, 24.)

Between the time Mrs. Zell gave her recorded statement to Jaeger on April 12, 2005, and when Jaeger arrived at Orr's Jewelers later that day, Mrs. Zell called David Gordon, owner of Orr's Jewelers, to ask him to not tell the truth to Federal about the bracelet being shipped from Pittsburgh to Las Vegas.  Gordon told Mrs. Zell that he would tell Federal the truth about how and when the bracelet was shipped to Las Vegas.  (Gordon Dep. at 41; R. Zell EUO at 101-03.)

Thus, when Jaeger interviewed David Gordon at Orr's Jewelers, he learned about Mrs. Zell's misrepresentation.  (Pls.' App. Ex. 1 at 32-33; Jaeger Dep. at 51.)  Gordon told Jaeger that the bracelet had been shipped to Mark Goldberg in Las Vegas.  (Pls.' App. Ex. 1 at 33.)  During a telephone call on April 15, 2005, Jaeger asked Mrs. Zell if she knew Mark Goldberg.  (Pls.' App. Ex. 1 at 31-32; Jaeger Dep. at 69.)  Mrs. Zell admitted that she had misstated the facts surrounding when and where she came into possession of the bracelet and admitted that she had asked Orr's to ship the bracelet to Las Vegas in order to avoid paying the seven percent Pennsylvania sales tax.  (Pls.' App. Ex. 1 at 31-32; Jaeger Dep. at 69-70.)

On June 28, 2005, Federal took an Examination Under Oath ("EUO") from both Mr. and Mrs. Zell.  Mrs. Zell again admitted to Jaeger that she had misstated the facts surrounding the

shipment of the bracelet.  (R. Zell EUO at 72, 100-01.)  Mrs. Zell explained that her motivation

was that she "was afraid that [she] would get in trouble with the State of Pennsylvania for not

reporting the sales tax."  (Id. at 101.)

Mr. Zell testified at his EUO on June 28, 2005 that Mrs. Zell did not have the bracelet

when they left for Las Vegas, and she did not wear it on their flights from Pittsburgh to Las

Vegas.  (J. Zell EUO at 84-85.)  When asked why he had previously stated to Jaeger that Mrs.

Zell had the bracelet when they traveled to Las Vegas, Mr. Zell responded that he forgot and he

made an assumption that Mrs. Zell had the bracelet with her.  (Id. at 85, 94-96.)  He also stated

that he might have misunderstood the question posed to him.  (Id. at 116.)

During its investigation, Federal never contacted the Geanopuloses.  (N. Geanopulos

Decl. ¶¶ 7, 9; S. Geanopulos Decl. ¶¶ 7, 9), nor did Federal speak with anyone at the Phoenix

airport.  Jaeger stated that he left a message at the Phoenix airport and never followed up.

(Jaeger Dep. at 36.)

Federal made the decision to deny the claim on September 21, 2005 and it notified the

Zells by letter on that date that it was denying their claim pursuant to the "Concealment or Fraud"

provision of the Policy.  (Pls.' App. Ex. 1 at 10; Def.'s App. Ex. U.)

Procedural History

Plaintiffs filed this action on February 3, 2006 in the Court of Common Pleas of

Allegheny County.  Count I alleges a claim for breach of contract and Count II alleges a claim for

bad faith under 42 Pa. C.S. § 8371.

On February 23, 2006, Defendant removed the case to this Court on the basis of diversity

of citizenship in that Plaintiffs are Pennsylvania citizens; Federal is an Indiana insurance

company with its principal place of business in Warren, New Jersey; and the amount in controversy, including the punitive damages and attorney's fees, exceeds the sum of $75,000.00, exclusive of interest and costs.  (Notice of Removal ¶¶ 4-9.)[14]

On March 2, 2006, Federal filed an answer and counterclaim.  (Docket No. 3.)  The counterclaim alleges that Plaintiffs committed fraud in violation of the Pennsylvania Insurance Fraud Act, 18 Pa. C.S. § 4117.  On October 30, 2006, Defendant filed a motion for summary judgment.

Standard of Review for Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v.

---

[14]     Docket No. 1.

Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Federal argues that: 1) Plaintiffs made material misrepresentations in violation of the Concealment or Fraud provision of the policy and thereby voided it; 2) Federal did not engage in bad faith because it conducted a fair and timely investigation of the claim and possessed a reasonable basis for denying it; and 3) Plaintiffs committed insurance fraud in violation of § 4117.

Plaintiffs respond that: 1) the misrepresentation about how the bracelet arrived in Las Vegas was not material to the coverage issue; 2) Federal acted in bad faith by stopping its investigation once it learned of the misrepresentation and using it as a pretext to deny the claim; and 3) there are genuine issues of material fact precluding granting summary judgment for Federal on its insurance fraud counterclaim.

<u>Count I: Breach of Contract</u>

In Count I, Plaintiffs allege that Defendant breached its contractual responsibilities by denying the claim for loss of the bracelet.  Defendant moves for summary judgment on the ground that Plaintiffs committed an act of "concealment or fraud" under the policy and therefore it had a reasonable basis for denying the claim.

The Federal policy contains the following general condition:

**Concealment or fraud**
We do not provide coverage if you or any covered person has intentionally concealed or misrepresented any material fact relating to this policy before or after a loss.

(Def.'s App. Ex. C at 17.)

Under Pennsylvania law, an insurance policy is void for misrepresentation when the insurer establishes three elements: 1) that the misrepresentation was false; 2) that the insured

knew that the misrepresentation was false when made or made it in bad faith; and 3) that the representation was material to the risk being insured.  New York Life Ins. Co. v. Johnson, 923F.2d 279, 281 (3d Cir. 1991) (citations omitted).  See also Tudor Ins. Co. v. Township of Stowe, 697 A.2d 1010, 1017 (Pa. Super. 1997).  In this case, Plaintiffs admit that Mrs. Zell's representation about how the bracelet arrived in Las Vegas was false and that she knew it at the time, but they contend that it was not material to the risk being insured.

Plaintiffs do not admit that Mr. Zell made an intentional misrepresentation about how the bracelet arrived in Las Vegas.  They note that he was not involved in the decision to ship the bracelet, that he testified that he merely assumed that his wife had it with her on the plane, that they took several flights during the trip and that he may have misunderstood the question.  (J. Zell EUO at 82, 85, 94, 116.)  He also denied that he and his wife had "gotten their stories straight" prior to their interviews, stating that she raised the idea and he refused to discuss it.  (Id. at 113-15.)

Defendant argues that Mr. Zell's knowledge of the falsity of his statements can be presumed from the fact that he "gave various reasons for the misrepresentations, including that he forgot, that he assumed his wife had the bracelet, and that he misunderstood Mr. Jaeger's question."  (Def's Br. at 14-15.)  In considering a motion for summary judgment, however, all inferences must be drawn in favor of the non-moving party, here the Plaintiffs.  There are genuine issues of material fact as to whether Mr. Zell's statement was an intentional misrepresentation.

Materiality

Courts have held that:

9

> The question of materiality is generally considered one of fact and law, but if the facts misrepresented are so obviously important that "reasonable minds cannot differ on the question of materiality," then the question becomes one of law that the court can decide at the summary judgment stage.  Gould v. American-Hawaiian S.S. Co., 535 F.2d 761, 771 (3d Cir. 1976); see Fine v. Bellefonte Underwriters Ins. Co., 725 F.2d 179, 183 (2d Cir.) (where statements are indisputably made and indisputably false, "the question seems purely one of law"), cert. denied, 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 162 (1984).  In the context of an insurer's post-loss investigation, "the materiality requirement is satisfied if the false statement concerns a subject relevant and germane to the insurer's investigation as it was then proceeding." Fine, 725 F.2d at 183; see Long v. Insurance Co. of N. Am., 670 F.2d 930, 934 (10th Cir. 1982) ("a misrepresentation will be considered material if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented").

Parasco v. Pacific Indemnity Co., 920 F. Supp. 647, 654 (E.D. Pa. 1996).

Federal cites a series of cases involving insurance claims arising out of fires in which courts concluded that the insureds' misrepresentations, usually about their financial situations at the time of the incidents, were material as a matter of law because they concealed a motive to commit arson that was relevant and germane to the investigation.  In the Parasco case, Anthony Parasco swore falsely when he stated that he did not submit fraudulent tax returns to banks to obtain a loan to buy a house when the unrebutted evidence showed that he had, and he lied when he stated that he was not attempting to actively sell the house before the fire when real estate agents testified that he had met with them and they had priced the house significantly lower than the figure he was seeking.  The record was clear as to his misrepresentations.

Parasco argued that the misrepresentations were not material because the fire's cause was accidental in nature.  The court concluded that Parasco's misrepresentations were clearly material to Pacific's investigation of the loss because it had knowledge that the fire was incendiary in nature, and thus whether he had a motive to commit arson was a reasonable and prudent subject

of inquiry.  Id. at 654-55.

Similarly, in Saracco v. Vigilant Insurance Co., 2000 WL 202274 (E.D. Pa. Feb. 22, 2000), aff'd mem., 250 F.3d 736 (3d Cir. 2001), the court concluded that Michael Saracco made at least four material misrepresentations or omissions during Vigilant's investigation into the fire that destroyed his home: 1) he lied that his mortgage lender had never threatened to foreclose on the house when the evidence was clear that he had been sent a notice of intention to foreclose four months before the fire and had received numerous phone calls about his delinquent mortgage payments; 2) he lied that he was not having any financial difficulties when his tax return showed total income in the amount of $752 for the year before, he and his wife had numerous loans with significant balances due and they had made a number of expensive purchases; 3) he included items that were not damaged in the fire or that he did not own (including a piano actually owned by Henry LeClair, who had lived with the Saraccos for a time and then was staying with Michael's step-father and who refused Michael's attempt to have him "forfeit" the item in lieu of unpaid rent); and 4) he knowingly attempted to conceal his step-father's identity and LeClair's location, when both men could have assisted (and later actually did assist) Vigilant in its investigation.

The court concluded that these misrepresentations were material because they showed Saracco had significant financial difficulties and a motive to burn the house and collect the insurance proceeds.  In addition, the submission of claims for property not damaged in the fire or not owned by Saracco was relevant to the issue of coverage, as was the concealment of LeClair's location.  Id. at *6.

In Sphere Drake Insurance Co. v. Zakloul Corp., 1997 WL 312217 (E.D. Pa. June 3,

1997), the insureds (Mojaswar and Nael Mustafa) signed a proof of loss which indicated that their corporation had no indebtedness when the record evidence established that it had; and they submitted a list of equipment destroyed in the fire which totaled $394,480 when the record established that they acquired it for only $90,532.  Again, the misrepresentations were material because the fire was incendiary in nature and it was relevant for the insurer to inquire into the Mustafas' financial situation to determine if they had a motive for committing arson.

In Peer v. Minnesota Mutual Fire & Casualty Co., 1995 WL 141899 (E.D. Pa. Mar. 27, 1995), Albert Peer made false statements in his EUO regarding his financial condition (he stated that he had no outstanding debts when he owed his employer $224,725 from two loans which he had acknowledged repeatedly) and his involvement in a prior lawsuit (by his ex-wife, which resulted in a judgment being entered against him in the amount of $54,821.56) and he intentionally concealed a material fact, namely the assignment of his insurance claim.  The court found these misrepresentations material to Minnesota's investigation of Peer's claim for property lost as a result of a fire as his financial condition was relevant to the issue of whether he had a motive for insurance fraud.  Id. at *10-11.

Thus, in all of these cases, the insurers had independent evidence that the losses were suspicious (i.e., arson rather than an accidental fire) and they were conducting a relevant inquiry into the insureds' financial situation when the insureds lied to conceal their motive to commit arson and collect on the policies.  As a result, the misrepresentations were relevant and germane to the investigations.  See also Lavin v. Fireman's Ins. Co. of Newark, N.J., 1992 WL 157691, at *2-3 (E.D. Pa. June 29, 1992) (insured lied when asked if he had been at his commercial property on the night of the fire that investigators concluded was arson, then finally admitted at his

12

deposition that he had been there).  But see Dempsey v. Auto Owners Ins. Co., 717 F.2d 556, 560

(11th Cir. 1983) (married man who lied by failing to reveal that he was with another woman on

the night of fire in order to conceal his affair did not misrepresent a material fact).

In this case, however, Federal has not demonstrated as a matter of law that the

misrepresentation was material to its investigation.  It first argues that Mrs. Zell's

misrepresentation was relevant to its establishment of a timeline including when the bracelet was

added to the policy, specifically whether it was added before or after the loss.  Federal contends

that, upon receipt of the claim, it conducted an investigation into, among other issues, whether

the bracelet was covered for $25,937.50 under the Newly Acquired Valuable Articles provision

of the policy, or as a scheduled item for its appraised value of $37,653.00 under the Valuable

Articles Floater to the policy, or a difference of $11,715.50.  (Rogers Decl. ¶ 8.)  According to

Federal, resolution of this coverage issue entailed investigating when the Zells purchased the

bracelet, when the Zells received the bracelet, and when it was added to the policy.  (Id. ¶ 9;

Jaeger Dep. at 33-34, 36, 40-41, 49-50, 60-64.)[15]

However, Mrs. Zell's misrepresentation concerned the question of *how* the bracelet

arrived in Las Vegas (whether she had it with her or whether it was shipped), *not* the date when

the item was added to the policy.  Mrs. Zell did not falsely state that the bracelet was added to the

policy on March 14, 2005 when it was in fact added on March 22, 2005.  Rather, she accurately

stated that contacted Orr's Jewelers on March 14, 2005 and requested that it fax an appraisal to

Tom Castracane for him to add the bracelet to the policy.  (R. Zell Statement Apr. 12, 2005 at 23;

---

[15]     Federal determined on July 29, 2005 that the bracelet was a scheduled item and would
have been covered for $37,653.00.  (Pls.' App. Ex. 1 at 20; Rogers Decl. ¶ 10.)

J. Zell Statement at 17-19.)  The record reflects that Orr's Jewelers faxed the appraisal to Castracane that same day.  (Pls.' App. Ex. 1 at 35; Castracane Decl. ¶ 4.)  Whether the bracelet was shipped to Las Vegas or the Zells had it with them on the plane has nothing to do with the issue of the date when Castracane added the bracelet to the policy.

Federal also cites several cases to support its argument that an insured's misrepresentation about when he or she took possession of an item can be relevant and germane to the insurer's investigation.  See Wassom v. State Farm Mut. Auto. Ins. Co., 173 S.W.2d 775 (Tenn. App. 2005) (insured lied in saying a car was stolen when in fact it was taken with permission and wrecked); Michalski v. Farmers Ins. Co., 2001 WL 63181 (Wash. App. Jan. 26, 2001) (insured lied about having a roommate at the time of the fire, which was material to the insurer's calculation of what constituted "necessary expenses" under the policy); Allstate Inc. Co. v. Priga, 810 F. Supp. 373, 377 (D. Conn. 1992) (insured misrepresented where he was living at the time of the fire, which was material because residence was an express condition of coverage under the policy).  These cases are irrelevant, however, because Mrs. Zell's misrepresentation did not concern how the loss occurred, nor was it related to any conditions that may have existed in the policy.  Federal has not demonstrated as a matter of law that Mrs. Zell's statement was relevant and germane to the issue of the date when the bracelet was added to the policy.

Federal also argues that the misrepresentation was material in that it "impeded" the investigation.  Specifically, it contends that it was investigating other potential sources of recovery in the event that it paid the Zells for the claim, and that coverage could have potentially come from a number of other sources, including insurance carried by Orr's Jewelers, One Service (the carrier Orr's used to insure the bracelet during shipment from Pittsburgh to Las Vegas),

14

Federal Express (the entity that shipped the bracelet) or Mark Goldberg, either personally or through his business.  However, as Plaintiffs note, Federal never conducted this investigation, despite the fact that it learned of Mrs. Zell's misrepresentation on the same day it occurred, and such an investigation would have been pointless because after Mrs. Zell obtained possession of the bracelet in Las Vegas, no recovery could have been obtained from any of these sources. Federal's argument is also undermined by its statement that it "never contested that the Zells traveled from Pittsburgh to Las Vegas and then to Los Angeles as they had claimed, or that Mrs. Zell had the bracelet with her while she was in Beverly Hills."  (Docket No. 29 ¶ 33.)

In addition, Federal's argument is a circular one: all misrepresentations can be said to impede an insurer's investigation in that the company might have to take the time to uncover the truth of the matter.  This fact does not make all misrepresentations material.

This case is also distinguishable from the arson cases Federal cites because it cites no independent evidence that the loss was suspicious.[16]  As noted above, the misrepresentations in Parasco, Peer, Sphere Drake and Saracco were material because the insurers had independent evidence that the fires had been set deliberately.  In this case, the only evidence of "suspicion" to which Federal points is the fact that the bracelet appeared to have been added to the policy after it was reported lost.  However, this discrepancy was attributable to the Zells' insurance agent, who received a fax on March 14, 2005 but inexplicably failed to take action for over a week thereafter. Once this issue was resolved, Federal was able to calculate the amount of coverage the Zells would have had on the bracelet, but it denied coverage because of Mrs. Zell's misrepresentation,

---

[16]     For example, Federal could cite evidence that Mrs. Zell was seen wearing the bracelet after the date she reported its loss to demonstrate that her claim was fraudulent.

15

even though it did not relate to the question of when the bracelet was added to the policy.

Indeed, Federal has not even attempted to argue that it had reason to believe that Mrs. Zell's misrepresentation was made for the purpose of defrauding the insurer with respect to any matter that was important to its investigation.  Rather, the record supports her statement that she lied because she was afraid of getting in trouble with the state for not paying the seven percent sales tax.  Her statement about why she lied was corroborated by David Gordon (Gordon Dep. at 27-28) and even Daniel Jaeger stated at his deposition that Mrs. Zell told him she lied because she was concerned about the tax issue (Jaeger Dep. at 70).  As Plaintiffs note, once it learned of the misrepresentation, Federal stopped investigating the circumstances of the loss and focused exclusively on Mrs. Zell's misrepresentation as a means of denying the claim.

Finally, although it does not do so explicitly, Federal's briefs appear to argue implicitly that the misrepresentation, even if not material, was relevant because it raised the insurer's concern that Mrs. Zell was lying about other matters, such as whether the bracelet was lost at all. For example, in response to Plaintiffs' argument that Federal made no attempt to contact Nicholas and Sophia Geanopulos, with whom Plaintiffs stayed during their trip to Los Angeles, and who observed Mrs. Zell wearing the bracelet, Federal responds that it:

> ultimately denied the claim because of Plaintiff's lies to Mr. Jaeger as well as a result of its conclusion that the Zells failed to prove that they had in fact lost the bracelet–not that Mrs. Zell did not have it with her in Beverly Hills.  Indeed, all of the available evidence established that the bracelet was shipped to her and received by her in Las Vegas.  It was therefore irrelevant that she had it with in Beverly Hills, and is completely irrelevant to the Court's determination of this Motion.

(Docket No. 28 at 5.)

Implicit in this statement is the proposition that Mrs. Zell's "evidence" of the loss

16

(namely, her statement concerning how it occurred) was "insufficient" because Federal did not believe it, and the basis for Federal's disbelief is its discovery that Mrs. Zell had misrepresented how the bracelet arrived in Las Vegas. In other words, Federal concluded that it would not believe her testimony (or that of her husband) about the loss of the bracelet because she had lied about another matter, even though this is not the proper standard to apply. The statements of Mr. and Mrs. Geanopulos are relevant insofar as they provide support for the truthfulness of Mrs. Zell's statements concerning the bracelet's movements after it arrived in Las Vegas.

More significantly, Plaintiffs note that they both voluntarily took and passed a polygraph examination in which they stated that they did not lie about the bracelet being lost or stolen. (Pls.' App. Exs. 4, 5.) Federal responds that these examinations are inadmissible in court. (Docket No. 28 at 5.) See also Docket No. 29 ¶¶ 37-38 (referring to the polygraphs examinations as "a self-serving effort to bolster the plaintiffs' otherwise non-existent credibility.") However, the issue is not whether the statements are admissible in court, but whether they are relevant to the issue of the Zells' truthfulness. Federal has not explained how Mrs. Zell could "prove" that she lost the bracelet other than by testifying as to the circumstances surrounding the loss and the polygraph examination that she passed constitutes evidence that her testimony about this matter is truthful. Federal cannot merely argue in a brief (with no explanation) that the Zells failed to prove that they lost the bracelet and at the same time refuse to consider evidence (and contend that this Court should refuse to consider evidence) that they told the truth about the circumstances surrounding the loss. In addition, Federal has no evidence to the contrary.

Plaintiffs have pointed to evidence that Federal may have rejected their claim on the basis that they were "lying about one matter, therefore lying about all." Further evidence that Federal

17

was utilizing this approach can be seen in the letter Federal sent to the Zells notifying them that

their claim was being denied.  The letter stated that, "[b]ecause Federal has been provided false

information by the insureds from the inception of this claim, Federal is not in a position to rely

upon that information provided by the insureds, to substantiate that a loss even occurred, as

alleged by Jeffrey and Ronna Sue Zell."  (Def.'s App. Ex. U at 3-4.)  See also Def.'s Br. at 21

("the fact that the insureds were willing to go to great lengths to avoid payment of $1,300 in

taxes was highly relevant to the question of their overall credibility and propensity to commit

fraudulent acts–such as insurance fraud."); Jaeger Dep. at 83 (Mrs. Zell's misrepresentation "in

itself called into question her credibility as to how this loss occurred.")

       Thus, despite Federal's argument about materiality, the record allows for an inference that

Federal's decision to deny coverage was not based on the materiality of the misrepresentation at

all.  Rather, it appears that Federal may have denied the claim because it concluded that the Zells

were lying about the loss, and the basis for this conclusion was that Mrs. Zell had lied about the

manner in which the bracelet arrived in Las Vegas.  This approach has no support in the law: as

explained above, courts have held that the misrepresentation must be material.  Moreover as cited

above, the policy itself also contained this requirement.  Otherwise, any misrepresentation would

give the insurer the right to void the policy under a non-existent "suspicion of lying" standard.[17]

       Defendant has not demonstrated as a matter of law that Mrs. Zell's misrepresentation was

material to the claim and its implied argument finds no support in the policy or in the law.

Therefore, with respect to Count I of the complaint, the motion for summary judgment should be

---

[17]     Nothing in this Report and Recommendation could or should be construed as condoning
Mrs. Zell's attempt to avoid paying sales tax or lying about it.  The issue in this case, as all
parties agree, is whether her misrepresentation was material to the claim.

denied.

Count II: Bad Faith

In Count II, Plaintiffs allege a claim of bad faith under Pennsylvania law, 42 Pa. C.S.

§ 8371.  Defendant moves for summary judgment on the grounds that it did not engage in bad

faith because it conducted a fair and timely investigation of the claim and possessed a reasonable

basis for denying it.  Plaintiffs respond that Federal acted in bad faith by stopping its

investigation once it learned of the misrepresentation and using it as a pretext to deny the claim.

A bad faith claim is distinct from the underlying contractual insurance claims from which

the dispute arose.  Nealy v. State Farm Mut. Auto. Ins. Co., 695 A.2d 790, 792 (Pa. Super. 1997),

appeal denied, 717 A.2d 1028 (Pa. 1998).  "Although the alleged bad faith need not be limited to

the literal act of denying a claim, the essence of a bad faith claim must be the unreasonable and

intentional (or reckless) denial of benefits."  UPMC Health Sys. v. Metropolitan Life Ins. Co.,

391 F.3d 497, 506 (3d Cir. 2004) (citations omitted).

In the Parasco case, the court concluded that Pacific conducted an objective and unbiased

investigation and only denied the claim after it became aware of the following undisputed facts:

1) four separate investigators concluded that Parasco set the fire; 2) he had the motive and

opportunity to do so; 3) he had been arrested and formally charged with setting the fire; 4) he had

submitted fraudulent financial information to the banks to finance construction of the home; and

5) he attempted to conceal his bank fraud and his efforts to sell the house from Pacific.  Thus,

Pacific had good cause to deny the claim.  920 F. Supp. at 655-56.  See also Saracco, 2000 WL

202274, at *7 (summary judgment granted for Vigilant on Saraccos' bad faith claim, because any

delay was caused in large part by their own concealments, misrepresentations and refusal to

cooperate and because Vigilant had a reasonable basis on which to deny the claim); Peer, 1995

WL 141899, at *12-13 (even though court assumed that the insurer's duty of good faith was

unconditional and independent of the insured's breach of the fraud and concealment provision,

summary judgment was still appropriate because insurer made $40,000 in partial payments while

investigating and denied the claims after the investigation disclosed evidence of fraud).

Here, by contrast, Defendant has not demonstrated as a matter of law that Mrs. Zell's

misrepresentation was material to its investigation and that it had a reasonable basis for denying

the claim.  Federal's decision to focus on Mrs. Zell's misrepresentation and not further

investigate the circumstances of the loss to determine if it was covered under the policy (such as

following through with the Phoenix airport) could be considered by the trier of fact as evidence

of bad faith in violation of § 8371.  Moreover, its position that neither it nor the Court may

consider any evidence that the Zells were telling the truth about the loss of the bracelet, such as

the testimony of the Geanopuloses and the results of the polygraph examinations, could be

construed as evidence that it was implicitly relying on a basis for denial of the claim (lying about

one matter, therefore lying about all) that has no support in the policy or the law, rather than

conducting a good-faith investigation into the loss.  Therefore, with respect to Count II of the

complaint, the motion for summary judgment should be denied.

<u>Defendant's Insurance Fraud Act Counterclaim</u>

In its counterclaim, Federal alleges that Plaintiffs violated the Pennsylvania Insurance

Fraud Act.  The Act provides that:

> (a) Offense defined.--A person commits an offense if the person does any of the
> following:
>
> ...

(2) Knowingly and with the intent to defraud any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim.

...

(g) Civil action.--An insurer damaged as a result of a violation of this section may sue therefor in any court of competent jurisdiction to recover compensatory damages, which may include reasonable investigation expenses, costs of suit and attorney fees.  An insurer may recover treble damages if the court determines that the defendant has engaged in a pattern of violating this section.

18 Pa. C.S. § 4117.

As observed by the court in Saracco:

Courts in this Circuit have held that this statute is aimed at criminal offenders who engage in a pattern of conduct, and that misrepresentations regarding the same subject matter or claim generally do not constitute a "pattern".  See Parasco, 920 F. Supp. at 657; Savadove [v. Vigilant Ins. Co.], 1999 WL 236602, at *11 n. 18 [(E.D. Pa. Apr. 21, 1999)]; Royal Indemnity Co. v. Deli by Foodarama, Inc. 1999 WL 178543, at *6 (E.D. Pa. Mar. 31, 1999) ("The act is aimed at serial offenders. Several misrepresentations regarding the same subject matter or made in connection with a single transaction or claim generally do not constitute a "pattern" within the meaning of § 4117."); Ferrino v. Pacific Indemnity Co., 1996 WL 32146, at *4 (E.D. Pa. Jan. 24, 1996); Peer v. Minnesota Mut. Fire & Cas. Co., 1995 WL 141899, at *13 (E.D. Pa. Mar. 27, 1995).

2000 WL 202274, at *8.  See also Sphere Drake, 1997 WL 312217, at *8 (genuine issues of material fact existed as to whether the Mustafas made their false statements with an intent to defraud).

In this case, Defendant has not demonstrated that Plaintiffs made a misrepresentation "concerning any fact or thing material to the claim," there is no evidence that Plaintiffs engaged in a "pattern" within the meaning of § 4117 because Mrs. Zell's misrepresentation concerned a single claim, and there are genuine issues of material fact as to whether the false statement was made with an intent to defraud Federal, rather than to conceal a non-payment of sales tax, as

21

Plaintiffs contend.  Therefore, with respect to Defendant's counterclaim, its motion for summary judgment should be denied.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Defendant (Docket No. 20) be denied.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

/s/  *Amy Reynolds Hay*
United States Magistrate Judge

Dated:   21 May, 2007

cc:   Hon. Terrence F. McVerry
      United States District Judge

      All counsel of record by Notice of Electronic Filing